IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:07-CR-95 |
| | ) | (VARLAN/GUYTON) |
| JOHN WESLEY IRONS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This case is before the Court on the defendant's suppression motions: Motion to Suppress Confidential Marital Communication [Doc. 23], Motion to Suppress Defendant's Statement to Officers after Request for Counsel [Doc. 24], and Motion to Suppress Defendant's August 8, 2007 Statement as a Result of Law Enforcement's Illegal "Save Jane" Ruse [Doc. 25]. Also pending before this Court is the defendant's related Motion *In Limine* to Exclude All Derivative Evidence Obtained Directly or Indirectly from Confidential Marital Communications Pursuant to *Wong Sun v. United States* and the Fruit of the Poisonous Tree Doctrine [Doc. 40].

The parties appeared before the Court for an evidentiary hearing on the suppression motions on October 30, 2007 [Docs. 36, 38]. This hearing was continued on December 11, 2007 [Docs. 43, 46]. At the conclusion of this hearing, the parties requested the opportunity to file post-hearing

1

briefs, which were filed on February 25 and 29, 2008 [Docs. 50, 54]. Also on February 25, the defendant filed a motion [Doc. 52] to reopen the evidentiary hearing on the basis of a recently discovered letter to the defendant that he believed implicated the truthfulness of prior testimony. The Court permitted [Doc. 56] the evidence to be reopened and held an additional evidentiary hearing on May 5, 2008 [Docs. 62, 69]. The parties again asked to file post-hearing briefs [Docs. 66, 67], which were filed on June 13, 2008. On June 25, the Court ordered [Doc. 68] that the parties present oral argument on the motions. On August 13, 2008, the parties appeared and presented their arguments to the Court [Doc. 70]. The Court took the motions, evidence, briefs, and arguments under advisement on August 14, 2008.

## I. PARTIES' POSITIONS

The defendant is charged with fourteen counts of maliciously damaging and destroying government property while creating a substantial risk of injury to another and of setting fire to timber, relating to fires in the Cherokee National Forest on August 13, 2002 (counts 9-12), August 14, 2002, (counts 13-14), and March 31, 2007 (counts 1-8). The defendant seeks to suppress all evidence of [Doc. 23] or derived from [Doc. 40] confidential marital communications with his wife Ann Irons. He contends that certain recorded telephone conversations between him and Mrs. Irons are privileged because they were related to the reconciliation of their marriage. Moreover, he asserts [Doc. 40] that any evidence in this case that was obtained as a result of investigators listening to confidential marital communications must also be suppressed as "fruit of the poisonous tree."

2

The government argues [Doc. 34] that the marital communications privilege is not applicable here because Mr. and Mrs. Irons were estranged at the time of the conversations. It also contends that the defendant waived the marital privilege with regard to the fires because he discussed them with a third party, Officer Jane Wright. Finally, it asserts that even if the marital communications privilege is deemed to apply in this case, Mrs. Irons can still testify to her observations of the defendant's actions and appearance because the privilege extends only to spoken communication.

The defendant also challenges the admissibility of his August 8, 2007 statement given to forest officers on two grounds: (1) it was made without the benefit of counsel despite defendant's request therefor [Doc. 24] and (2) he gave the statement because of the coercive tactics of the forestry agents [Doc. 25]. The defendant contends that upon his arrival at "the Blockhouse" following his arrest, he asked for an attorney. He maintains that the officers continued to question him, despite his clear request for counsel. The government responds [Doc. 29] that the defendant did not request counsel but executed a rights waiver and gave a sworn statement.

The defendant also argues that his statement was not voluntary but was, instead, the product of psychological coercion on the part of the forestry agents. In support of this contention, he asserts that prior to making his statement, he was arrested in a Wal-Mart parking lot with Forest Service Officer Jane Wright and was stunned with a Taser. He was then taken to a remote location (the Blockhouse), interrogated for one and one-half hours, and threatened that Wright would be arrested if he did not confess. He was then taken to another location, where officers threatened to arrest his handcuffed wife if he did not confess. His wife begged him to confess, and he was questioned for another one and one-half to two hours. The defendant maintains that his will was overborne by the totality of the circumstances surrounding his confession. While admitting that Officer Wright and

3

Mrs. Irons were involved in a ruse to arrest the defendant, the government responds [Doc. 35] that the defendant's statement was freely and voluntarily given.

## II. FACTS

At the August 23, 2007 detention hearing,[1] United States Forest Service Special Agent Kevin Bishop testified that the sixty-year-old defendant has lived in the Coker Creek Community outside of Tellico Plains his entire life. For the past twenty years, the area of the Coker Creek Community adjacent to the Cherokee National Forest has experienced a large number of forest fires. While most forest fires are "road/set," which means they were set just off a road or trail, the majority of recent fires have been "walk/set," in which someone walks into the woods and sets the fire. The defendant, who is very lean, fit, and a good walker, has been a subject of interest to the Forest Service for the last ten years. The defendant was first identified as a suspect in 1989, when Officer Otis Burden was investigating a fire near the defendant's home and observed dogs follow a scent trial to within fifty yards of the defendant's house.

Agent Bishop testified that in 2001, Forest Service Officer Jane Wright investigated a fire near the defendant's residence and followed a trail created by someone walking through the woods. The trail led her to the back of the defendant's residence, where she was confronted by the defendant. A couple of days later, the defendant asked her to return to his house and showed her bullet holes in two trees. The defendant told Wright that he had just bought a large caliber gun and that she needed to be careful because the gun could penetrate her vest. Later in 2001, Forest Service

_____

[1]Because the parties refer to testimony from the detention hearing in their briefs, the Court has included a summary of that testimony here.

4

Officer Brian Webb investigated a suspected arson in the Mule Pen Gap area. He observed dogs follow a scent trail back to the vicinity of the defendant's residence. In 2002, Webb investigated three fires called the Hawk fires and concluded they were the products of arson.

Agent Bishop testified that the defendant's wife, Ann Irons, voluntarily cooperated with the Forest Service and reviewed a list of fires in which the defendant was a suspect. Mrs. Irons told the Forest Service that in August 2002, as she and the defendant were driving from their home to go on a vacation, she stopped the car near Natty Branch so that the defendant could relieve himself. The defendant walked up into the woods. While waiting on the defendant, she noticed a dead hawk by the side of the road. When they returned from their vacation four or five days later, she saw fire fighting activity in the area where they had stopped. She and the defendant heard about the Hawk fire on the scanner once they got back to their house. The defendant told her that he was surprised that it took so long for the fires to take off. In his statement, the defendant told agents that one fire he set on Hog's Branch took nine days to start up and that it might have been the one he set when he and his wife went on vacation. Bishop stated that six counts of the present indictment related to the Hawk fires. Around the time of the Hawk fires, several structural fires occurred in the Coker Creek Community. The home of David Chapman, who lives behind the defendant, caught fire. Dogs tracked a scent trail back to the defendant's residence where officers were confronted by the defendant.

Agent Bishop stated that in the spring of 2007, the Forest Service began covert surveillance around the defendant's home. On March 31, 2007, Agent Oates saw the defendant picking up trash alongside the Lower Smithfield Road. He was wearing faded blue jeans and a green t-shirt. Around 2:30 that afternoon, Oates saw the defendant walking secretively through the woods. The defendant,

5

who was wearing the same faded blue jeans and green t-shirt and who was carrying a black backpack, was being very quiet and stopping every couple of steps to look around him. A short time later, the defendant went back toward the forest walking on an old wooded service road. Between 7:30 and 8:00 p.m. that day, a fire was reported just east of the area, which was the direction in which Oates saw the defendant headed. Oates had seen no one else in the area that day. Dogs tracked a scent trail from the point at which Oates had last seen the defendant to one of the five fires on the slope. The dogs veered off the service road twice, and the officers discovered two more fires, one was a "pretty good size" and one had not taken off. These three fires, which were named the Polecat fires, are charged in the indictment.

Agent Bishop testified that Mrs. Irons later told the Forest Service that in late March, she had returned from a trip to California and picked up the defendant at a prearranged location. She saw the defendant emerge from the woods near the Unicoi Gap area, wearing faded blue jeans and a green t-shirt and carrying a black backpack. On the way to the defendant's truck, which was parked at her old home place, she saw that one of the fires had already taken off. She told the defendant that she was nervous about being caught. The defendant was surprised that one of the fires was already burning. In his statement, the defendant admitted driving to his wife's old home place. He said that he walked along the old road and carried a backpack containing matches and four or five candles. He admitted setting three or four fires above the old road and some on Flint Ridge before he walked out of the woods near Unicoi Gap.

Agent Bishop stated that Officer Eddie Graves was conducting surveillance at the defendant's home, when he saw the defendant shoot into the woods in front of his house with a high powered rifle. Graves reported that this occurred just after Graves had encountered the defendant

in the woods. Graves saw the defendant take one shot and heard two others. The shooting occurred in the direction of a hiking trail near the defendant's house. In a subsequent interview, the defendant acknowledged routinely shooting into the woods to scare off anyone that might be watching him.

Agent Bishop related that Mrs. Irons told the Forest Service that in the years since dogs had tracked the defendant back to their house, the defendant had changed his "tactics" and would drive or have her drive him to a location, from which he would walk into the woods. The defendant would have her pick him up at another location and return him to his vehicle. Mrs. Irons said the defendant would set fires with candles. She saw the defendant hiding candles in a firewood pile at her old home place. Agents later found sparklers but not candles at her homeplace. She has seen the defendant lighting candles in their home and timing how long it took them to burn. The defendant liked to use twelve-inch tapered candles, and she had bought hundreds of this kind of candle over the years. She said that the defendant admitted to her that he set fires when conditions were hot, dry, and windy. She said he would become anxious and upset and would want to go out and do something during these times.

Agent Bishop testified that the defendant had two state warrants for domestic violence arising out of an incident in which the defendant choked Mrs. Irons son on the porch and then threatened to kill her with a shotgun if she called the police. He also had a pending state charge for assaulting Mr. Dana Fagan with a stick because he believed that Fagan was talking about him setting fires in the community. Bishop stated that Mrs. Irons was concerned for her safety and the safety of her children. At the time of the detention hearing, Mrs. Irons was living in the house that she had shared with the defendant.

Agent Bishop testified that Officer Wright had a telephone conversation with the defendant on July 27, 2007. During that conversation, the defendant told Wright that if she came to arrest him, she would have to shoot him. He said that he would not be taken alive. He said that the older he got, the less he cared about dying. He also told her that he had thought about shooting himself or arranging for someone, like Wright, to shoot him. He admitted causing hundreds of fires in the woods and setting fire to about fifty houses in his lifetime. He told Wright that he started his first fire at age fifteen.

Agent Bishop stated that the defendant had admitted to both Agent Wright and Agent Russ Arthur that he had set forty or fifty structural fires. In an interview, the defendant admitted setting fire to the house of a Forest Service employee who was in charge of firefighting activity in that portion of the National Forest. The house had burned down at night and was occupied. The defendant called the employee and apologized. The defendant said he set the fire because he believed the employee was talking about him setting fires in the community. Bishop testified that the defendant said he set fires for revenge and when he believed someone was spreading rumors about him. The defendant also said he could not control when he set a fire.

Agent Bishop testified that the defendant was arrested in a Wal-Mart parking lot by Forest Service Agents accompanied by United States Marshals and local Monroe County Sheriff's deputies. The defendant exited his vehicle and was held at gunpoint. The defendant fidgeted with one of his hands in his pocket and did not readily obey commands from the marshals or agents. The defendant was stunned with a Taser in order to arrest him safely. A .38 revolver was found in his pocket. Mrs. Irons had told the agents that the defendant always carries a gun.

8

On cross-examination, Agent Bishop testified that the defendant has had both of his knees replaced, has high blood pressure, and is on several medications. He stated that Mrs. Irons, who had left the defendant, told Bishop many of the statements he had attributed to the defendant in his testimony. Mrs. Irons was afraid of the defendant and decided to leave him after the incident on May 23, 2007, in which he threatened her with a shotgun. She called Officer Wright and Officer Brian Webb to warn them about going near their house because the defendant was dangerous and the situation was deteriorating. Bishop agreed that Mrs. Irons did not take out warrant against the defendant for the May 23 incident until August 3, ten weeks later. He acknowledged that the Forest Service used Mrs. Irons to make recorded telephone calls to the defendant in order to get him to admit to setting fires. The Forest Service had thirty-one recorded calls and messages involving the defendant. Bishop agreed that the defendant had denied setting fires many times during those calls. The defendant wanted his wife to come back home and stated in the telephone conversations that he would do anything if she would return. Although Mrs. Irons bought candles and drove the defendant to locations related to the fires, she was not charged. Bishop said that although there was an informal agreement with Mrs. Irons that in all likelihood she would not be charged, she had been informed in mid-July that she could be charged as a co-conspirator.

Agent Bishop stated that Officer Wright had several telephone conversations with the defendant and that she tried to get him to admit to setting fires. The defendant initiated the telephone calls to Agent Wright. Bishop agreed that the defendant and Wright had developed a friendship and that Wright was playing on that friendship to get the defendant to admit to the fires. He acknowledged that Wright had used the fact that the defendant wanted his wife to come home to try to get him to confess to starting fires.

Agent Bishop testified that approximately ten officers were present in the Wal-Mart parking lot when the defendant was arrested. He said the defendant eventually took his hands out of his pockets and had nothing in his hands. A few moments later, the defendant did not comply with a command to get down, and a marshal stunned him with a Taser. The defendant then collapsed and was handcuffed. Officer Wright was present when the defendant was arrested and was also handcuffed. The officers wanted the defendant to believe that Wright was also in trouble and that he could save her career by confessing to the fires. The defendant was given the choice of being interviewed at the jail or at a roadside park outside of Madisonville. The defendant was taken to the park location and advised of his rights, and he signed a rights waiver. Two officers went to the interview. The defendant was interviewed for one and one-half hours. He was driven to see his wife, who was also handcuffed. Bishop said that Mrs. Irons told the defendant that she was in trouble and that "he needed to cooperate to help himself and help Ann and Jane." The interview of the defendant continued after he met with his wife. The defendant gave two statements, one the day of his arrest and one the following day. Roughly six hours elapsed from the time the defendant was arrested until he arrived at the Blount County Jail.

Hope Olivia Roberts, the defendant's daughter, testified that divorce papers for the defendant and Mrs. Irons were at her house. She said the defendant was going to come to her house to sign them the day he got arrested.

At the October 30, 2007 hearing, Russ Arthur, a Special Supervisory Agent for the United States Forest Service, testified that he met Ann Irons, the defendant's wife, on July 12, 2007, when she approached the government about the defendant's activities. She said that she wanted the defendant caught for the safety of her children and the community. Mrs. Irons told him that on May

23, 2007, the defendant had choked her son and threatened her with a gun. On May 25, she flew to Alaska. She returned home in June 2007 and stayed at the house she shared with the defendant from June 3 through June 13. She then returned to Alaska and contacted the Forest Service about the defendant. On July 12, she met with Arthur. Mrs. Irons told him that she was never with the defendant when he set fires but that after awhile, she knew what he was doing. She had purchased items to help the defendant and had driven him or picked him up on occasions when he had set fires. Arthur did not promise anything, including that she would not be prosecuted, to Mrs. Irons in return for her information. Mrs. Irons played telephone messages left on her cellular telephone from June 2 to July 12 by the defendant and Hope, the defendant's daughter from a previous marriage, for Arthur.

Arthur testified that between July 18 and August 7, 2007, he listened in on telephone conversations between Mrs. Irons and the defendant. On July 27, 2007, he listened to a telephone call between the defendant and Forest Service Officer Jane Wright, in which the defendant admitted his involvement in wildfires and residential fires. On August 7, Officer Wright called the defendant and set up a meeting at Wal-Mart. The defendant was arrested between 10:15 and 10:30 a.m. on August 8, 2007. The Wal-Mart location had been chosen for officer safety because the defendant lived in a remote, wooded area and was known to shoot into the woods indiscriminately. Arthur also believed the manner in which they planned to conduct the arrest would provide a "psychological advantage for an interview."

Arthur said that he met with the defendant and Agent Jenny Davis later that day outside Tellico Plains. Davis told him that she had Mirandized the defendant. Mrs. Irons was with Arthur and was in handcuffs. The defendant was allowed to talk with Mrs. Irons, and then Arthur

interviewed the defendant again. He took the defendant into the woods so that the defendant could relieve himself, but the defendant was unable to do so. He also helped the handcuffed defendant get a drink of water from a stream. The defendant admitted to Arthur that he was bothered by setting fire to Forest Service employee Rex Kelly's home and said that he would like to apologize to Kelly. Arthur called Kelly and allowed the defendant to talk to him.

Arthur stated that the defendant finished giving his statement to Agent Davis. The defendant was shown the statement, flipped through it, and pointed out an error to Davis. Davis corrected the error, and then the defendant signed the statement. The defendant was then taken to the Blount County Jail, where he was booked around 4:25 p.m. Arthur interviewed the defendant again at the Blount County jail the next morning at 8:00 a.m. before the defendant's initial appearance. He asked the defendant whether he had hired an attorney, and the defendant said that he did not like attorneys. The defendant acknowledged that Davis had advised him of his rights the previous day. The defendant then gave a three-page statement and signed it.

On cross-examination, Agent Arthur testified that when he met with Mrs. Irons on July 12, she said that she and the defendant had not lived under the same roof since June 13. He agreed he had previously testified that Mrs. Irons had read books about the mind of a psychopath and had made suggestions about "investigative tools" to use with her husband. Arthur said prior to Mrs. Irons' entry into the investigation, the Forest Service had evidence linking the defendant to over ten fires in the area based upon the similarities in the way in which the fires were set, similarities in the residences, two occasions in which dogs tracked the perpetrator back to the defendant's house, and one visual track back to the defendant's house. He described the defendant as having a "walk/set" method of setting fires, in which he would walk several miles from a road and set a fire that might

12

not surface until hours or sometimes days after it was set. He agreed that despite this evidence, he was focused on getting an admission from the defendant.

Arthur testified that it was his idea, not Mrs. Irons', to stage the arrest of Officer Wright. He believed that it was not improper to stage an arrest in order to obtain a confession. He said that Wright had a rapport with the defendant, and the defendant did not perceive her to be a threat. He explained that he engaged in the ruse of arresting Wright for many reasons, including to prevent the defendant from discovering his wife's involvement in the case or how long they had been monitoring his calls and watching him. Prior to the arrest, Arthur had told Wright to pretend to be arrested and that she would be handcuffed. At the time of the arrest, Wright was handcuffed to give the appearance that she was in trouble and that the officers may have been monitoring her telephone conversations with the defendant. Part of the ruse was to allow the defendant to believe that he could help Wright. At the time of the arrest, numerous law enforcement officers were present with their guns drawn. The defendant was stunned with a Taser and fell to the ground.

Arthur testified that he chose Agent Davis to interview the defendant because she was "low-key, not very aggressive." He directed Davis to give the defendant the option of making a statement at the jail or somewhere by the side of the road on the way to the jail because he wanted the defendant to feel comfortable. Arthur testified that he was with the defendant between 1:00 and 3:00 p.m. on the day of his arrest. He estimated that although the defendant was arrested around 10 a.m. and not booked until 4:25 p.m., the defendant was interviewed a total of only two to three hours over the course of that day. He agreed that part of his reason for exploiting the defendant's paranoia and staging the arrest of Wright was to get the defendant to make a statement.

13

Arthur testified that the defendant was brought to him around 1:00 p.m. Mrs. Irons was there and handcuffed in order to cause the defendant to think that she might be arrested. He did not tell Mrs. Irons what to say to the defendant. She told the defendant that she had told the government everything she knew and that he should too. The defendant had told Arthur that he did not believe that his wife was under arrest. Mrs. Irons feared for her and her children's safety, and Arthur wanted to give the defendant the impression that Mrs. Irons was also being arrested to protect her. Arthur agreed that part of the ruse was to have the defendant think that he had to help Wright and Mrs. Irons.

Arthur testified that after the defendant spoke with Mrs. Irons, Agent Davis continued the defendant's interview in her vehicle. At one point, Davis and the defendant got out, and he helped the defendant get a drink of water and relieve himself. The defendant, who was handcuffed, lay on his stomach to get a drink from a stream. After this, the defendant became very open with Arthur. Arthur offered to get chicken and potatoes for the defendant from Tellico Pride. He did not advise the defendant of his Miranda rights, but he confirmed with Davis that she had reviewed the rights waiver with the defendant. The defendant was continuously handcuffed and was never free to leave. Davis wrote out the defendant's statement, which was six handwritten pages long. She started writing out the statement at the Blockhouse and completed it in Arthur's presence. He reiterated that the defendant signed it in his presence.

Deputy United States Marshal Warren Mays testified that he participated in the plan to arrest the defendant. During the planning session, he learned that the defendant was in good physical condition, was extremely savvy in the woods, commonly went armed, had made threats in the community, had possibly tried to intimidate those by whom he felt threatened, and had stated that

he admired the events that occurred at Ruby Ridge and Waco. The officers planning the arrest decided to do it in a public location such as Wal-Mart for the safety of the community, the officers, and the defendant. The plan was to use Officer Jane Wright, a participant in the Forest Service's undercover operation, to get the defendant to meet her at Wal-Mart.

Deputy Marshal Mays testified that the defendant came to the Wal-Mart parking lot and was standing beside his car when Mays approached him. Mays, Arthur, Becky Gamble of the Knoxville U.S. Marshal's Office, and a local Sheriff's Department captain attempted to surround him. Mays drew his weapon because the defendant's right hand was gripping what appeared to be a handgun in his jeans. The defendant took a combative stance and appeared prepared to flee. Mays was twelve feet from the defendant and was wearing body armor with a badge on it. He identified himself as a law enforcement officer and told the defendant to show his hands. The defendant did not comply at first but removed his hands from his pockets and crossed them upon a second command. He told the defendant to get down, but the defendant did not comply. Mays gave Officer Kingsley the signal to stun the defendant with a Taser. Kingsley stunned the defendant once. The defendant was searched and handcuffed. Mays pulled the Taser barbs from the defendant, who said he did not need medical attention. The defendant appeared to be alright, so he turned the defendant over to Agent Arthur and the Forest Service.

On cross-examination, Mays agreed that he had a heightened sense of concern about the defendant because he had been told that the defendant had made comments relating to Ruby Ridge. Ten law enforcement members and four or five vehicles were involved in the arrest. He explained that a Taser fires a projectile into the skin of the individual through which an electric shock is administered. The electric shock causes the person to collapse. Based upon the pre-operation

15

planning, he knew that the Forest Service agents planned to interview the defendant before taking him to the Blount County Jail.

Ed Kingsbury, an investigator with the Knoxville Police Department's Organized Crime Unit, testified that he was present in the Wal-Mart parking lot for the defendant's arrest on August 8, 2007. He was concerned about the defendant being armed and decided to stun him with the Taser once. When he left, the defendant seemed fine and was standing and talking. On cross-examination, he testified that he made the decision to use the Taser on his own, because the defendant would not show Deputy United States Marshal Mays his hands but, instead, crossed his arms in a combative stance.

Jenny Davis, a Special Agent for the United States Forest Service stationed in Asheville, North Carolina, testified that on August 8, 2007, she assisted in an arson investigation in Tellico Plains, Tennessee. After the defendant was arrested in a Wal-Mart parking lot, she and Officer Brian Webb placed the defendant in Webb's vehicle. She offered the defendant water and granola bars, but he declined. She engaged in small talk with the defendant and told him she was friends with Officer Wright. The defendant agreed to be interviewed, and she asked him if he would rather be interviewed at the jail or a wooded location, the Tellico Blockhouse. The defendant chose the Blockhouse. The defendant asked if Wright were in trouble. She told him that Wright was potentially in trouble and had been arrested. She asked if he would agree to be interviewed with Wright, and he said that he would prefer to be interviewed with her.

Agent Davis testified that the defendant sat down under a shade tree, and around 11:00 a.m., she advised him of his Miranda rights from a form. She gave the form to the defendant to read, but he said he did not have his reading glasses. The defendant declined her offer to read the form again

16

and said he understood his rights. He said he was willing to talk to her, but he did not want to sign the waiver form. She noted the defendant's refusal to sign on the form and then began interviewing the defendant, who was sitting and later reclining across from her with Officer Wright beside him. The defendant was hesitant at first and asked whether Wright and Mrs. Irons were in trouble. She told him that Wright potentially faced criminal charges for obstruction of justice and that she had information that his wife had been aiding and abetting him in setting fires. She went over a list of fires with the defendant and told him that she believed that he had an emotional problem that caused this uncharacteristic behavior. The defendant was silent and whispered to Officer Wright at times but finally, he "broke down" and admitted that he had a problem with setting fires. Agent Davis asked the defendant to give her more details about the fires he had admitted to Officer Wright and his wife. After about one hour, she told him it was time to take him to the jail. Upon the defendant's request, Officer Webb took him closer to the river to relieve himself.

Agent Davis testified that she and Webb offered the defendant water and a candy bar when he got back in their vehicle but that he declined. On the way to jail, Arthur radioed that he had arrested Mrs. Irons. Davis asked the defendant if he would like to see Mrs. Irons before he went to jail, and he said that he would. They met Arthur at Baker's Grave Road around 1:00 p.m. The defendant and Mrs. Irons, who were both handcuffed, spoke for three to five minutes. The defendant agreed to continue his interview with Davis. Before she took the defendant to her car, Mrs. Irons told him that she had told the truth and she wanted him to do so too. The defendant told Davis that he had set the Spring Creek fire and hundreds of fires in the Cherokee National Forest along with forty structural fires. The defendant described using candles, box delay devices, and sparklers to set the fires.

17

Agent Davis testified that the defendant asked to use the restroom again and that Agent Arthur took him into the woods. When they returned, Arthur said the defendant had admitted to setting Forest Service employee Rex Kelly's house on fire. The defendant wanted to apologize to Kelly so they drove to a bank parking lot where they had cellular telephone reception, and the defendant spoke with Kelly. During the drive, the defendant and Arthur talked about hunting. They returned to Baker's Grave Road, where she finished writing out the defendant's statement and read it to him. The defendant squinted as he looked over the statement. He told her to make a correction, and then she read the statement to him again. She asked the defendant if he would sign the rights waiver at that time, and he agreed. He initialed the waiver three times and signed it, and then he signed his statement.

On cross-examination, Agent Davis testified that she had worked for the Forest Service for seventeen years and that she was friends with Officer Wright. The defendant had seen officers handcuff Wright at Wal-Mart, and Davis told him that Wright was arrested. Her interview strategy was to lead the defendant to believe that the Forest Service had a strong case against him and that he needed to give a truthful confession in order to help himself during the sentencing phase. She agreed that she knew the defendant was having marital trouble. She had Wright brought to the interview scene because she knew that Wright and the defendant were close. She thought having a friend there would help the defendant to be open with her in the interview. At one point during the interview, Wright chastised her for making the defendant out to be a monster. Davis interviewed the defendant for approximately one hour, while he lay beside Wright and they were both handcuffed.

18

Agent Davis testified that when the defendant saw his wife, there were tears in his eyes. Davis believed that seeing his wife and hearing her encourage him to tell the truth brought the defendant to an emotional breaking point, even though earlier in the interview the defendant had told her that he thought a ruse was afoot. The defendant had already admitted setting fires, but after seeing his wife, he gave Davis more details. She completed the defendant's statement around 3:00 p.m. She had written 11:03 a.m. on the rights waiver at the time that she initially advised the defendant of his rights, not when he initialed the waiver. The defendant refused to sign the waiver at first, but he signed it at the conclusion of the interview. At some point during the interview at the Blockhouse, the defendant placed an "X" on the signature block of the statement. She believed the defendant was "toying" with the officers at this point. The defendant told her he did not believe his wife or Officer Wright were in trouble.

The parties returned to continue the evidentiary hearing on December 11, 2007, and the government played a recording of a July 27, 2007 telephone conversation between the defendant and Officer Jane Wright. During the conversation, the defendant admitted that he had set hundreds of fires, including fires at houses. He told Wright that he carried a gun at all times and that if someone tried to arrest him, he would not be taken alive.

Special Agent Russ Arthur was recalled and testified that he met with Mrs. Irons on July 12 in a small conference room at a hotel across from the airport in Knoxville. He listened to the messages on her cellular telephone at that time. The recording of the conversation between Agent Wright and the defendant was made after this meeting.

The defense called Agent Jenny Davis, who testified that on August 8, 2007, the defendant left the Wal-Mart parking lot around 10:35 a.m. following his arrest. At the Blockhouse, she headed

19

the paper on which she made handwritten notes with the time of 11:00 a.m. She advised the defendant of his rights at 11:03 a.m., as noted on the waiver. She noted that at 11:51 a.m., she began to write out the defendant's statement. She agreed that it would have been inappropriate to interview the defendant before she advised him of his rights, and she testified that she did not do so.

Officer Jane Wright testified that she first met the defendant in 1998 when she was investigating a fire. In her capacity as a Forest Service officer, she had walked in the National Forest with the defendant two to five times between 1998 and around 2004. She said that during that time period, she encountered the defendant and Mrs. Irons frequently in the community or while she was working in the area of their house. She did not have any contact with the defendant from 2003 or 2004 until her telephone conversation on July 27, 2007. While Wright was on vacation in the summer of 2007, she received a telephone message from Mrs. Irons saying that Mrs. Irons urgently wanted to speak with her. Her investigation in this case began after receiving that message. When she called Mrs. Irons back before Mrs. Irons' July 12 meeting with Forest Service agents, Mrs. Irons forwarded messages that the defendant left on Mrs. Irons' cellular telephone to Wright's cellular telephone. The defendant called Wright on the morning of July 27, 2007, at his wife's request. During that call, the defendant told her that he was having marital problems. She made a recorded call to the defendant later that day at Special Agent Arthur's request. Several law enforcement officers and Mrs. Irons were present during the call.

Agent Wright testified that during the July 27 call, the defendant repeatedly asked her if the call was being recorded, and she denied that it was. She acknowledged that the defendant named other people, whom he said were setting fires. She agreed that the defendant had denied a number of the fires that she accused him of setting. Wright told the defendant that it would make his wife

happy if he would be truthful.

Agent Wright testified that she was involved in the plan to arrest the defendant on August 8, 2007. Part of that plan was for her to pretend to be arrested at the time of the defendant's arrest and to be handcuffed. The primary reason for faking her arrest was because it was the safest way to arrest the defendant. She was handcuffed and present lying beside the defendant during his interview at the Blockhouse, but she was not involved in the interview. When she first arrived at the Blockhouse, she heard Agent Davis read the defendant his rights. The defendant wrote an "X" on the rights waiver while she was there, but he did not want to sign it. She did not overhear the defendant ask for an attorney. She agreed that during the defendant's interview at the Blockhouse, she told Agent Davis not to talk to the defendant like he was a bad person. She said that the defendant rolled over top of her so that he was between Agent Davis and her. The defendant whispered to her during the interview.

Wright stated that prior to the defendant's arrest, the other officers did not talk with her about helping interview the defendant. It was Davis's job to get a confession from the defendant, not hers. She did not ask the defendant any questions during the interview. Her presence at the Blockhouse was not part of a plan, and she would characterize her involvement there as "general patrol." She did not know that Mrs. Irons was also going to pretend to be arrested.

On cross-examination, Wright agreed that the defendant was a strong-willed individual. The defendant appeared to understand the Miranda warnings when Agent Davis gave them to him. On redirect examination, Wright said that while they were at the Blockhouse, the defendant whispered to her that he loved her and would never say a word against her. She did not respond to this statement. She stated that during some of their telephone conversations, the defendant had talked

21

with her about marriage and sex but that she had tried to avoid the topic.

Defendant John Wesley Irons testified that he was arrested on August 8, 2007. He was taken to the Blockhouse and as he got out of the vehicle, he asked Agent Davis if he could call his attorney. He said that Davis told him, "Not right now." Davis never advised him of his rights. She asked him if he knew his rights, and he said, "Yes, I want to speak to an attorney." He refused to sign the paper that Davis read to him.

On cross-examination, the defendant testified that on the way to the Blockhouse, Agent Davis and Agent Webb asked him if he had been setting fires, and he said, "No." When they arrived, Agent Webb got out and went to the back of the vehicle. He was alone in the van with Davis when he asked for an attorney. Davis interviewed him in the middle of a field for thirty minutes, and then she asked him if he knew his rights. He said that he did and asked to call his attorney, but Davis ignored him. Officer Wright was present at that time. He talked with Davis for about one hour after that.

The defendant testified that he first saw the six-page statement attributed to him when his attorney showed it to him a month after his arrest. On the day of his arrest, he could not have seen it because he was not wearing his glasses. He agreed that the statement bore his signature but denied signing it. He believed that someone had forged his signature on the statement, commenting that the signature was a little sloppier than he writes. He did not know whether he made the "X" on the paper or not. He said that Davis told him to sign a paper, but he told her he did not want to sign it. When she continued to hold the paper out, he put an "X" on it to satisfy her. He asked for an attorney three times after his arrest: Twice on the day of his arrest and once the next day.

The government called Officer Larry Brian Webb in rebuttal. Officer Webb testified that he arrived on the scene shortly after the defendant's arrest on August 8, 2007. His job was to transport the defendant to the interview location and then on to the jail. He was in the vicinity of Agent Davis while she interviewed the defendant, and he never heard the defendant ask for an attorney. After the interview and while en route to the Blount County Jail, Webb called Pretrial Services Officer Twilla Tucker, who asked if the defendant wanted an attorney. Webb asked the defendant, and the defendant said he did not think he needed an attorney and he did not like attorneys. Around 8:00 a.m. the next morning, Webb heard the defendant say that he did not trust attorneys and did not think they were useful.

On cross-examination, Officer Webb testified that earlier that day, he had suggested the Blockhouse as a possible location for the interview. Officer Jane Wright was part of the interview process but was not on general patrol as the Blockhouse was not inside the National Forest. He was never at a briefing with Wright in which her role during the interview was discussed. At the Blockhouse, Wright and the defendant were reclining by a tree within a foot of each other. Wright and the defendant had their heads turned toward each other and appeared to be talking. During ninety-five percent of the interview, he stayed in the truck to make sure that the public did not intrude on the interview. The defendant did not seem emotional.

At the May 5, 2008 hearing, Ann Irons testified that she and the defendant had been married for nine years. In June and July of 2007, she did not take any legal action to affect her marital status, although she was told by Hope Roberts, the defendant's daughter, that divorce proceedings were underway. During that time period, she left a telephone message for Forest Service Officer Jane Wright but did not begin communicating with Wright for several weeks. On five or six occasions,

23

she forwarded copies of messages left by the defendant from her cellular telephone to Officer Wright's cellular telephone. Wright received and listened to the messages. Mrs. Irons did not believe the investigation of the defendant began at this time. Instead, she thought that the Forest Service had been investigating the defendant for years prior to this. She had seen people watching their house, and she had overheard the defendant tell federal agents that he knew he was under investigation. She had seen ATF agents lead dogs into their yard once, and there were dogs in the general area twice.

Mrs. Irons testified that after forwarding the defendant's messages to Officer Wright, she told Wright that she and the defendant were having marital problems. She did not go into detail about what the defendant was doing. She offered the Forest Service insights about her husband based upon books about sociopaths in order to help the defendant. She agreed that she and Wright had come up with a plan on how to conduct the investigation and have the defendant confide and make statements. After she sent the messages to Wright, Wright arranged a meeting with Russ Arthur and Kevin Bishop in a Knoxville hotel. At that meeting, she played the defendant's messages for the agents. The agents told her to preserve the messages. At that time, she and the agents believed that the defendant had filed divorce proceedings. She did not think the defendant considered his telephone conversations to be private because he had previously told her to expect that someone was listening any time she talked on the telephone. She admitted that she did not tell the defendant that she was going to share his messages with the government. At the meeting with Arthur and Bishop, she did not discuss with the agents how she could help to arrest the defendant. They discussed how the defendant had become dangerous and needed help before hurting himself or others. She did not recall the agents stating that they had information linking the defendant to the fires.

24

Mrs. Irons testified that in late July, Officer Wright had been taken off the case because she had other duties. Mrs. Irons suggested to Arthur and Bishop that she believed the defendant would talk to Wright. She denied ever discussing with Wright how Wright could exploit her and the defendant's marital problems, nor did she advise Wright to talk with the defendant about sex. She was in the room at the Cleveland office of the Forest Service when Wright called the defendant, and she heard Wright talk with the defendant about sex and marriage. Between the late 1990's and 2002, Wright had come to their house frequently when investigating fires and had talked with the defendant "like one of the guys." Mrs. Irons estimated that Wright came to their house more than five times and that sometimes a year would elapse between visits. She talked with Wright prior to the phone call with the defendant at which she was present, and this meeting was the only time that she was present when agents made a recorded telephone call to the defendant.

Mrs. Irons testified that she did not tell the defendant that she was working with the government because "there would have been bloodshed." She agreed that Arthur and Bishop helped her take out a warrant for domestic violence against the defendant. She acknowledged that she had never pursued domestic violence charges against the defendant on her own. Throughout the investigation, the government told her not to talk to the defendant. She agreed that she had talked with Officer Wright after Wright testified at the December 11, 2007 evidentiary hearing. She said that Wright did not disclose information about the hearing to her.

Mrs. Irons identified a letter dated February 1, 2008, that she had written to the defendant. The eight-page letter, which was made an exhibit to the hearing, describes her feelings for the defendant and what she and her children had been doing since his arrest and incarceration. Mrs. Irons acknowledged that she included in the postscript that the letter was "not going to go over well

with the Government." She said she meant that the Forest Service agents with whom she had worked and the Assistant United States Attorney would not be happy with her because her statements in the letter about Officer Wright could lead to further legal issues. She explained that her statement in the letter that she would tell the defendant "everything I know about the investigation, my part in things I learned that took place over the years," did not conflict with her testimony about how she learned that the defendant was under investigation. She denied that the government had provided her with additional information about the investigation.

Mrs. Irons testified that she had written in the letter that Officer Wright had "also gone through hell," because Wright had gotten to know the defendant while investigating him over the years and had expressed sorrow for what might have happened during the defendant's childhood. Mrs. Irons said that the recorded conversation with the defendant was difficult for Wright. She acknowledged that based upon her conversations with Wright, she knew, as she stated in her letter, that Wright had also struggled with the right way to handle the situation. She said this was not because Wright had reservations about arresting the defendant but because she knew Irons' family would be torn apart. Officer Wright also told Mrs. Irons that she understood how Irons felt she was betraying her husband, yet felt compelled to do so to protect him and others from injury.

Mrs. Irons testified that she had spoken with Officer Wright at least ten times since the December 11 hearing, but they had not talked about Wright's testimony at the hearing. She said that they did not talk about Wright trying to get the defendant to have sex with her while they were lying beside each other on the day of the arrest and that, as far as she knew, that never happened. She said that she wrote that the public did not know "the whole story" and that she and Wright had been "portrayed often in less than flattering ways," because of newspaper articles depicting her as a "gold

digger" and Wright as having a relationship with the defendant. She denied meaning that Wright had not been candid in her testimony or with her supervisors. She reiterated that Wright did not want her to write to the defendant and did not ask her to put anything in the letter.

Mrs. Irons testified about an email message that she sent to Agent Kevin Bishop after the defendant filed his motion to reopen the evidentiary hearing. In the email message, she gave a chronology of her relationship with Officer Wright and the contact that she had with Wright over the last four or five years. She stated that while she was in Alaska and was talking with Wright, Wright assured her that Wright was not telling anyone they were talking. The email states that Wright was actually telling her supervisor Russ Arthur about their conversations. Mrs. Irons testified that on the night before the arrest, Wright visited her at the camper where she was staying but did not tell her about the arrest planned for the next day. At 10:00 a.m. on the day of the arrest, Arthur asked her to meet him at Kefauver Park in Madisonville, Tennessee. When Arthur pulled up with Wright and held out Mrs. Irons .38 pistol, she knew the defendant had been arrested. They sent her to her house where officers were waiting to be let in with "bomb dogs." Later, Arthur came to her house and asked her to help again. He told her that the defendant was not being forthcoming in his interview, so she agreed to meet the defendant and she asked him to tell the truth. She denied that she and Wright or anyone from the government had discussed her faking her arrest before that day.

Officer Jane Wright was recalled and testified that she was aware of Mrs. Irons' February 1, 2008 letter to the defendant because Mrs. Irons had told her about it and had read it to her after she sent it. She had no knowledge of it before it was sent, although she admitted that she had spoken with Mrs. Irons frequently after the December 11 hearing. She had told Mrs. Irons that she had

testified at the December 11 hearing, but she did not tell her the specifics of her testimony. Mrs. Irons read the letter to her because Mrs. Irons knew that she would tell Agent Bishop about it. After Mrs. Irons read the letter, they did not discuss its contents. Wright denied telling Mrs. Irons that she was conflicted about the right thing to do in investigating and arresting the defendant, that she had gone through hell because of the way the defendant was investigated and arrested, or that she had conducted the investigation to save the defendant's soul.

.

## III. ANALYSIS

The defendant seeks to suppress the recorded telephone messages he left on Mrs. Irons' cellular telephone in June and July 2007, recorded telephone conversations between he and Mrs. Irons, and any evidence resulting from law enforcement's knowledge of those messages and conversations. He also seeks to suppress the six-page statement that he gave on August 8, 2007, because the police continued to question him after he had requested an attorney and because the statement was not freely and voluntarily given.

### A. Suppression of Marital Communications

The defendant argues that the recorded messages that he left on Mrs. Irons' cellular telephone and telephone conversations between himself and Mrs. Irons that were surreptitiously recorded by government agents are protected by the marital communications privilege. Privileges under federal law are governed by the common law as interpreted by caselaw. Fed. R. Evid. 501. Federal law recognizes two distinct privileges with regard to spouses: (1) The adverse testimony privilege by which one spouse cannot be forced to testify against the other in a criminal proceeding

28

and (2) the confidential communications privilege, which protects communications between spouses made in confidence during the marriage. United States v. Porter, 986 F.2d 1014, 1018 (6th Cir. 1993). Only the testifying spouse can assert the adverse testimony privilege, whereas the marital communications privilege can be asserted by either spouse. Id. Unlike the adverse testimony privilege, the marital communications privilege may be asserted even after the marriage has ended. Pereira v. United States, 347 U.S. 1, 6 (1954). The policies underlying the two privileges differ:

> "The testimonial privilege looks forward with reference to the particular marriage at hand: [T]he privilege is meant to protect against the impact of the testimony on the marriage. The marital communications privilege in a sense, is broader and more abstract: [I]t exists to insure that spouses generally, prior to any involvement in criminal activity or a trial, feel free to communicate their deepest feelings to each other without fear of eventual exposure in a court of law."

Porter, 986 F.2d at 1018 (quoting United States v. Byrd, 750 F.2d 585, 590 (7th Cir. 1984)).

In the present case, the defendant seeks to invoke the marital communications privilege to suppress the telephone messages left for his wife and recorded telephone conversations between he and his wife. In order for the marital communications privilege to apply, three conditions must exist: "(1) At the time of communication there must have been a marriage recognized as valid by state law; (2) the privilege applies only to 'utterances or expressions intended by one spouse to convey a message to the other,' and (3) the communication must be made in confidence." Id. (citation omitted) (quoting United States v. Lustig, 555 F.2d 737, 748 (9th Cir.), cert. denied, 434 U.S. 926 (1977) & 434 U.S. 1045 (1978)). Moreover, the privilege does not apply when the communications in question are regarding joint criminal activity between the spouses or when the communications occur after the spouses have permanently separated, although they are not divorced. Id. at 1018-19.

29

In the present case, the three prerequisites to the marital communications privilege are satisfied. Mrs. Irons testified at the May 5, 2008 hearing that she and the defendant had been married for nine years and were still married at the time of the hearing. The record is devoid of any evidence that their marriage was not valid under Tennessee law. Although the defendant's daughter testified at the detention hearing that she had divorce papers at her house that the defendant planned to sign, the defendant never signed that paperwork. The telephone messages left by the defendant on Mrs. Irons' cellular telephone and the telephone conversations between he and his wife qualify as utterances attempting to convey a message.

Finally, with regard to the confidentiality of the telephone messages and conversations, the Court notes that marital communications are presumed to be confidential. Blau v. United States, 340 U.S. 332, 333 (1951). The fact that the recorded telephone conversations between the defendant and Mrs. Irons were monitored by government agents does not defeat the confidentiality of these communications because the defendant did not know that they were being monitored or recorded.[2] C.f. United States v. Klayer, 707 F.2d 892, 894 (6th Cir. 1983) (holding that telephone conversation was not protected by the marital communications privilege when both husband and wife knew that insurance adjuster was also on the telephone). The Court finds Mrs. Irons' testimony that the defendant had once told her to expect that any time she talked on the phone, someone was listening, to be too general to implicate the telephone messages and conversations in question. Moreover, the

_____

[2]In United States v. Singleton, the Eleventh Circuit examined a tape-recorded conversation between a husband and wife, which was obtained when the husband wore a body wire at the government's request. 260 F.3d 1295, 1298 (11th Cir. 2001). The Court disallowed the marital communications privilege because it held that the couple was permanently separated at the time of the conversation. Id. at 1299. In discussing whether the couple's separation defeated the presumption of confidentiality for marital communications, it did not address the actual confidentiality of the conversation in light of the body wire. Id.

fact that Officer Wright testified that the defendant asked her whether their July 27, 2008 telephone conversation was being recorded belies an assumption on the part of the defendant that his telephone conversations were always monitored. The government also argues that during the recorded conversations between the defendant and Mrs. Irons, the defendant stated that he thought the calls were being "taped." The Court finds that the defendant's statement of his suspicion that the call was being recorded does not rise to the level of the confidentiality breach in Klayer, in which both spouses knew the insurance adjuster was part of the telephone call. See id. Accordingly, the telephone messages and conversations at issue here appear to qualify as confidential marital communications.

The government argues that the privilege does not apply because defendant and Mrs. Irons were separated for two months during the time the defendant left the telephone messages and had the telephone conversations with Mrs. Irons. The Sixth Circuit recognizes an exception to the marital communications privilege when the spouses were "permanently separated" at the time of the communication. Porter, 986 F.2d at 1019. In Porter, the wife had not seen her defendant husband while she was hospitalized and for a week thereafter. Id. at 1018. The wife then "moved out" and the couple never reconciled, subsequently divorcing. Id. The defendant's former wife testified at trial that ten to twelve days after she moved away, the defendant called her and told her that he had traveled out of state to purchase drugs. Id. The Sixth Circuit held that the trial court had not abused its discretion in admitting the testimony, observing: "While [the wife] had not been separated from [the defendant] for a long period of time, [the defendant] had not visited his wife during her hospitalization and she had 'moved out.' Moreover, we know with hindsight that their separation at the time of the communication was indeed permanent." Id. at 1019.

31

Other circuits considering this issue have likewise declined to apply the marital communications privilege when the couple is permanently separated. United States v. Singleton, 260 F.3d 1295, 1298 (11th Cir. 2001) (limiting the marital communications privilege to utterances between couples who are "still cohabiting pursuant to [a valid] marriage"); United States v. Frank, 869 F.2d 1177, 1179 (8th Cir.), cert. denied, 493 U.S. 839 (1989) (taking into account that the couple was permanently separated); United States v. Roberson, 859 F.2d 1376, 1381 (9th Cir. 1988) (determining that if the trial court finds that the couple was separated at the time of the communication, it must assess whether the separation was irreconcilable); In re Witness Before Grand Jury, 791 F.2d 234, 238 (2d Cir.1986) (observing that courts should look to the length of time the couple had been living apart when the communication occurred to determine whether there had been a permanent separation); United States v. Byrd, 750 F.2d 585, 591-94 (7th Cir. 1984) (holding that "the communications privilege does not apply where the communications occur between permanently separated spouses"). Once the couple is permanently separated, the purpose behind the marital communications privilege is eclipsed by the need for the evidence:

> [S]ociety's interest in protecting the confidentiality of the relationships of permanently separated spouses is outweighed by the need to secure evidence in the search of truth that is the essence of a criminal trial, and that proof of permanent separated states at the time of the communication between the defendant and the defendant's spouse renders the communications privilege automatically inapplicable.

Singleton, 260 F.3d at 1299. The Eleventh Circuit has interpreted permanent separation to mean, "living separately with no reasonable expectation of reconciliation." Id. In order to determine whether the spouses were permanently separated at the time of the communication, courts look to whether the spouses were living together at the time of the communication, how long they have been living apart, and whether divorce proceedings have been initiated by either party. Id. The court may

also consider evidence of intent to reconcile or lack thereof.  Id.

In the present case, the government argues that Mrs. Irons did not live at the marital residence for two months,[3] during which time the messages and conversations were made.  Although Mrs. Irons was in Alaska during the time in which she received at least some of the messages from the defendant, Agent Arthur testified that Mrs. Irons returned to her and the defendant's home from June 3 to June 13, 2007.  Mrs. Irons testified that the defendant's daughter led her and the agents to believe that the defendant had initiated divorce proceedings, but the record contains no evidence that either party had actually filed for divorce during the relevant time frame.  In fact, the defendant's daughter testified that the divorce paperwork remained at her house unsigned because of the defendant's arrest.  The defendant's pleadings characterize the messages and conversations in question as attempts to reconcile with Mrs. Irons.  Agent Bishop testified at the detention hearing that the defendant wanted his wife to come home and stated in their conversations that he would do anything to accomplish that.  Moreover, the February 1, 2008 letter introduced at the May 5 hearing reveals that Mrs. Irons still considered the defendant to be her husband at that time and that she wanted to be with him in the future.  Accordingly, the Court finds that the defendant and Mrs. Irons were only living apart for a short time when the communications in question were made, that neither party had formally initiated divorce proceedings at that time, and that the communications themselves as well as Mrs. Irons' subsequent letter to the defendant indicate an intent to reconcile.

---

[3]In its February 2, 2008 Post-Hearing Memoranda [Doc. 50], the government states that Mrs. Irons left the defendant on May 25, 2007, and went to Alaska to stay with relatives.  She returned to her and the defendant's house on June 3, 2007, and stayed for approximately ten days.  On June 13, 2007, she returned to Alaska.  She came back to Tennessee around July 10, 2007, but did not return to her home.  The government asserts that all of the recorded telephone conversations between the defendant and Mrs. Irons occurred after June 13, 2007, while the couple was separated.

Based upon these facts, the undersigned determines that the defendant and Mrs. Irons were not permanently separated at the time of the telephone messages and conversations at issue in this case. Thus, the messages and conversations do not fall within the exception for permanently separated spouses.

The government also contends that the defendant waived the marital communications privilege by divulging the content of those communications to Officer Jane Wright. It asserts that in a recorded telephone conversation with Officer Wright, the defendant admitted setting over one hundred fires in the woods and at least fifty house fires, and he explained how he set fires. The government cites a Seventh Circuit case in which the court observed that the confidentiality of marital communications is lost when the spouse seeking to assert the privilege tells a third party the content of the communications he or she is seeking to exclude. United States v. Lea, 249 F.3d 632, 642 (7th Cir. 2001); see also United States v. Bahe, 128 F.3d 1440, 1442-43 (10th Cir. 1997) (remarking that the defendant could theoretically waive the marital communication privilege by telling a third party about the communicative action in question but performing the same act on the victim did not waive it). Nevertheless, in Lea, the court held that the marital communications privilege still applied because the husband spoke with FBI agents on a similar topic (the presence of maggots at his employer's business) but the conversation was not "categorically and literally identical" to the one he had with his wife. Similarly, in the present case, the defendant's attempts to reconcile with his wife were distinct from the conversation with Officer Wright, even though he discussed the forest fires with both.

The United States Court of Appeals for the District of Columbia has also examined the waiver of the marital communications privilege when the party asserting the privilege disclosed part

34

of the communications in pleadings to the court. <u>Securities & Exchange Comm'n v. Lavin</u>, 111 F.3d 921, 933 (D.C. Cir. 1997). In that case, the Lavins, a husband and wife, asserted the marital communications privilege to exclude taped telephone conversations between them from production pursuant to a subpoena. In a memorandum, they quoted a brief portion of one of the conversations in order to show their belief that their conversations were not being recorded. The court held that the disclosure did not waive the privilege because the Lavins were not trying to shield their conversations with the privilege while simultaneously using a portion of the protected conversation to gain an advantage against the SEC in the litigation. <u>Id.</u> The court recognized that

> [t]he prohibition against selective disclosure of confidential materials derives from the appropriate concern that parties do not employ privileges both as a sword and as a shield. The purpose of the privilege is to protect the confidentiality of marital communications: "[it] is intended only as an incidental means of defense and not as an independent means of attack, and to use it in the latter character is to abandon it in the former."

<u>Id.</u> (quoting <u>In re Sealed Case</u>, 676 F.2d 793, 818 (D.C. Cir. 1982) (discussing attorney-client and work product privileges)). The court held that the Lavins' disclosure was "not an unfair tactical manipulation of the privilege." <u>Id.</u> In the present case, the defendant is not asserting the marital communications privilege while simultaneously seeking to wield some portion of the telephone messages or conversations he is seeking to exclude to attack the government's theories in this case. The Court finds that the defendant's discussion with Officer Wright did not waive the marital communications privilege for his telephone messages and conversations with his wife, even though there may be some overlap in topics discussed, specifically the fires.

The defendant argues that not only should the marital communications themselves be excluded from admission at trial, but all evidence gained in the investigation that was derived from the initial disclosure of the recorded telephone messages to government agents is also inadmissible

as "fruit of the poisonous tree." The government maintains that the fruit of the poisonous tree doctrine does not apply to privileged information. It also asserts that the marital communications privilege does not extend to observations of a spouse's activities or appearance or to the disclosure of information to law enforcement.

Our Supreme Court has held that both physical and verbal evidence obtained in derogation of the Fourth Amendment must be excluded from trial. Wong Sun v. United States, 371 U.S. 471, 485-86 (1963). The "fruit of the poisonous tree doctrine" excludes not only that evidence that was illegally seized, but all evidence gained from the "'exploitation'" of an illegal search or seizure unless that evidence is sufficiently attenuated from the illegal actions as to "'purge[ it] of the primary taint.'" Id. at 488 (citing Maguire, Evidence of Guilt, 221 (1959)). The defendant argues that all the evidence gathered in this case is the fruit of the primary illegality–the revelation of privileged marital communications to Forest Service agents–and, as such, must be excluded under the fruit of the poisonous tree doctrine. In so arguing, the defendant seeks to compare apples to oranges. The marital communications privilege is a product of federal common law. See Wolfe v. United States, 291 U.S. 7, 12 (1934); Fed. R. Evid. 501. It does not arise from Fourth Amendment protections, nor does it enjoy any constitutional basis. United States v. Benford, 457 F. Supp. 589, 597 (D. C. Mich. 1978); see also United States v. Giavasis, Nos. 85-3557, 85-3558, 1986 WL 18086, at *5 (6th Cir. Oct. 15, 1986) (DeMascio, J., dissenting) (opining that "the marital privilege does not have constitutional underpinnings" and, thus, could not form the basis for a suppression motion).

Privileges must be construed narrowly because they hinder the pursuit of truth. United States v. Nixon, 418 U.S. 683, 710 (1974) (examining the executive privilege). No privilege "prevents the

Government from enlisting one spouse to give information concerning the other or to aid in the other's apprehension." Trammel v. United States, 445 U.S.40, 53 n.12 (1980); Giavasis, 1986 WL 18086, at *3 (holding that the marital communications privilege only excludes certain testimony, it does not prevent a spouse from cooperating with law enforcement or revealing confidential information to the police). Accordingly, the marital communications privilege prevents a spouse from testifying about confidential communications that occurred during the marriage but does not foreclose testimony about the spouse's observations as to the other spouse's actions and appearance. Pereira, 347 U.S. at 361-62 (stating that the marital communications "privilege, generally, extends only to utterances, and not to acts"); United States v. Hook, 781 F.2d 1166, 1173 n.11 (6th Cir. 1986) (rejecting defendant's "contention that acts of giving his wife money to pay household bills were communicative acts protected by the federal common law privilege for confidential marital communications"); United States v. Robinson, 763 F.2d 778, (6th Cir. 1985) (holding wife's testimony about finding bill of sale and her husband tearing it up related to actions rather than expressions and, thus, was not privileged); see also Giavasis, at *3 (determining that the marital communications privilege does not prevent a spouse's "testimony as to acts" of the defendant spouse). Additionally, the marital communications privilege does not exclude other evidence obtained as a result of one spouse's disclosure of confidential marital communications to the police. Giavasis, 1986 WL 18086, at *3.

Moreover, even if the fruit of the poisonous tree doctrine were to apply to common law privileges, the Court finds this case contains ample evidence that the United States Forest Service was investigating the defendant for setting fires long before its agents learned of his messages and subsequent recorded conversations with Mrs. Irons. Special Agent Bishop testified that the

37

defendant first became a suspect in 1989, and he described the evidence that the Forest Service had gathered relating to the defendant over a ten-year period.  Special Agent Arthur testified that before Mrs. Irons entered into the investigation, the Forest Service had evidence linking the defendant to over ten fires, including two occasions on which dogs had tracked the perpetrator back to the defendant's house and one instance of a visual "track back" to the defendant's house.  The defendant points to Officer Wright's testimony that she did nothing to investigate the defendant in 2007 before she was contacted by Mrs. Irons and heard the messages from the defendant as proof that the entire investigations was based upon the revelation of the marital communications at issue.  The Court finds that this testimony does not contradict Bishop's and Arthur's testimony that the defendant had been the subject of investigation by the Forest Service for a number of years.  Thus, the Court can only conclude that the entire investigation of the defendant was not the fruit of Mrs. Irons revealing confidential marital communications to government agents.

Accordingly, the Court finds that the marital communications privilege excludes the introduction at trial of the messages left by the defendant on Mrs. Irons cellular telephone and the recorded telephone conversations between the defendant and Mrs. Irons.  It does not exclude Mrs. Irons' testimony about the defendant's acts or appearance or about her cooperation with government agents.  Nor does it exclude any other evidence gained by the government, including that evidence gained as a direct result of government agents listening to the marital communications in question. The Court recommends that the defendant's Motion to Suppress Confidential Marital Communication [Doc. 23] be granted and that his Motion *In Limine* to Exclude All Derivative Evidence Obtained Directly or Indirectly from Confidential Marital Communications Pursuant to *Wong Sun v. United States* and the Fruit of the Poisonous Tree Doctrine [Doc. 40] be denied.

38

## B. Suppression of the Defendant's August 8, 2007 Statement

The defendant contends that a six-page, handwritten statement attributed to him on August 8, 2007, should be suppressed because (1) it was taken in violation of his Fifth Amendment right to counsel and (2) it was not knowingly and voluntarily given.

*(1) Request for Counsel*

In order to protect his or her Fifth Amendment right to be free of compelled self-incrimination, a person enjoys the right to have counsel present during custodial interrogation. Miranda v. Arizona, 384 U.S. 486, 469 (1966). Once an individual invokes his right to counsel under Miranda, law enforcement may not continue to question him or her or subsequently approach the individual for questioning until the individual has counsel available. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); United States v. Soto, 953 F.2d 263, 264 (6th Cir. 1992) (observing that police must stop questioning defendant held in custody once he requests an attorney). Questioning of the person may not resume in the absence of an attorney "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85. The rule in Edwards is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Michigan v. Harvey, 494 U.S. 344, 350 (1990). The defendant's request for counsel must be unequivocal and unambiguous, such "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Davis v. United States, 512 U.S. 452, 459 (1994).

In the present case, the defendant contends that after he was arrested and taken to the Blockhouse location, he requested counsel before Agent Jenny Davis advised him of his Miranda rights. He asserts that Davis ignored his unequivocal request for an attorney and proceeded to

interrogate him in violation of his Fifth Amendment right against self-incrimination. He argues that his subsequent refusal to sign the rights waiver corroborates his request for counsel. The government responds that after their arrival at the Blockhouse, Agent Davis advised the defendant of his rights by reading from the waiver. The defendant stated that he understood his rights, but he declined to sign the waiver. Davis interviewed the defendant at the Blockhouse, and then took him to Baker's Grave Road, where Agent Arthur confirmed with Davis that the defendant had been advised of his rights under Miranda. The government maintains that Davis and Arthur continued the defendant's interview at that location, and Davis then compiled the information from the defendant into a statement. She read the statement to the defendant, who insisted upon a correction and then agreed to sign the statement. At that time, the defendant initialed and signed the rights waiver and then signed the six-page statement. The government asserts that at no point during the interview did the defendant ask for an attorney.

The Fifth Amendment question in this case essentially turns upon a factual determination of whether and when the defendant requested counsel. The defendant testified at the December 11, 2007 evidentiary hearing that he requested a lawyer on three occasions following his arrest: First, to Agent Davis as he exited the vehicle at the Blockhouse; second, to Davis after she asked him if he knew his rights and while he was in the presence of Officer Wright; and third, on the following day. He said the first time that he saw the six-page statement attributed to him was when it was shown to him by his attorney about one month after his arrest. He acknowledged that the signature on the statement was his, although he said it was sloppier than he usually wrote, but he denied ever signing the statement. He opined that someone must have forged his signature on the statement.

The Court finds the defendant's testimony to conflict directly with that of the government witnesses. Agent Jenny Davis testified that once they were seated under a tree at the Blockhouse location, she advised the defendant of his Miranda rights from a waiver form. The defendant said that he understood his rights, but he refused to sign the waiver. Davis noted the defendant's desire to talk but refusal to sign on the waiver form. Davis then proceeded to interview the defendant with Officer Wright present. About an hour into the interview, Davis took the defendant to Baker's Grave Road, where they met Agent Arthur and Mrs. Irons. The defendant agreed to continue the interview. At the conclusion of the interview, Davis compiled the defendant's statement from notes she had made during the interview. She then read the statement to the defendant, who requested a correction. She read the statement to the defendant again. At that time, the defendant agreed to sign the waiver, signed it, and then signed the statement.

Special Agent Russ Arthur testified that on the day of the defendant's arrest, he met with the defendant and Agent Davis in the afternoon. He confirmed with Davis that she had advised the defendant of his Miranda rights. After the defendant finished giving his statement to Davis, she showed the defendant his statement and he asked for a correction. Once Davis made the correction, the defendant signed the statement. Before the defendant's initial appearance the following day, Arthur asked him if he had hired an attorney. The defendant replied that he did not like attorneys. The defendant acknowledged that Davis had advised him of his rights the previous day.

At the December 11 evidentiary hearing, Officer Jane Wright testified that she was present during the defendant's interview at the Blockhouse following his arrest. Wright heard Davis read the rights waiver to the defendant. She said that the defendant wrote an "X" on the waiver form while she was present but did not want to sign it. She did not hear the defendant ask for a lawyer.

41

Officer Larry Brian Webb testified that he transported the defendant to the Blockhouse location. He was in the vicinity of Agent Davis while she interviewed the defendant, but he never heard the defendant ask for an attorney. Webb said that after the interview and while taking the defendant to jail, he spoke with a Pretrial Services officer, who asked if the defendant wanted an attorney. Webb relayed the question to the defendant, who stated that he did not think he needed an attorney and that he did not like attorneys. Webb also stated that he overheard the defendant express his distrust of lawyers on the following morning.

The Court credits the testimony of the four law enforcement officers[4] over that of the defendant. The defendant's statement, the rights waiver form, and the defendant's August 9, 2007 Affidavit, all of which were exhibits to the October 30, 2007 hearing, support the testimony of the officers. The defendant's statement, Exhibit 1, is signed and does contain some corrections. The Advice/Waiver of Rights form, Exhibit 2, is signed and initialed by the defendant and bears the notation, "wants to talk does not want to sign anything." Finally, the August 9th Affidavit, Exhibit 3, taken by Agent Arthur and signed by the defendant states "I am still aware of my rights under Miranda & understand I am making this statement w/o an attorney & having him present." In the Affidavit, the defendant acknowledges making a statement on the previous day.

---

[4]The defendant challenges the credibility of Officer Wright's testimony, arguing specifically that her testimony that she was not trying to get a confession from the defendant and did not know her role in the interview is contradicted by Agent Davis's testimony that Officer Wright did a good job in pretending to be arrested while Davis was interviewing him at the Blockhouse. The Court does not find this testimony to be incompatible. Even if Officer Wright had not discussed the role she would play in gaining the defendant's statement with the other law enforcement officers beforehand, she knew that she was to act as if she were arrested along with the defendant. The Court finds that Officer Wright's testimony was credible.

42

Accordingly, the Court finds that the defendant did not make an unequivocal and unambigous request for counsel, or indeed any request for an attorney, on the day of his arrest. The defendant argues that his refusal to sign the rights waiver form reveals that he believed that he could protect himself by such refusal like the defendant in Minnick v. Mississippi, 498 U.S. 146, 153 (1990). In Minnick, the defendant requested and was allowed to consult with an attorney. Id. at 148-49. Defendant Minnick was subsequently required to meet with officers without his attorney. Id. at 149. He was advised of his rights but refused to sign a rights waiver. Id. In response to questioning, the defendant confessed to shooting one of the two murder victims. Id. The Mississippi Supreme Court held that the defendant's Fifth Amendment right against self-incrimination was not violated because an attorney had been made available to him, as was required by Edwards. Id. at 150. The United States Supreme Court held that the availability envisioned by Miranda and its progeny was the presence of the requested attorney at the time the defendant was questioned. Id. at 151-52. The Court reflected upon its holding with respect to the facts of the case as follows:

> The case illustrates also that consultation is not always effective in instructing the suspect of his rights. One plausible interpretation of the record is that petitioner thought he could keep his admissions out of evidence by refusing to sign a formal waiver of rights. If the authorities had complied with Minnick's request to have counsel present during interrogation, the attorney could have corrected Minnick's misunderstanding, or indeed counseled him that he need not make a statement at all. We decline to remove protection from police-initiated questioning based on isolated consultations with counsel who is absent when the interrogation resumes.

Minnick, 498 U.S. at 154.

The instant case is distinct from Minnick in that the defendant never made the initial request for counsel. Instead, the defendant affirmed that he understood his rights even though he refused to sign the rights waiver, and he agreed to be interviewed by Agent Davis. A waiver of one's

43

Miranda rights does not have to be in writing in order to establish that the wavier was knowing and voluntary.  United States v. Miggins, 302 F.3d 384, 397 (6th Cir.), cert. denied, 537 U.S. 1097 (2002).  Here, the defendant was informed of his rights against self-incrimination and understood those rights, even though he did not sign the rights waiver before giving a statement.  The Court finds that the defendant's statement was not given in violation of his Fifth Amendment Right to counsel.[5]  Accordingly, it recommends that the defendant's Motion to Suppress Defendant's Statement to Officers after Request for Counsel [Doc. 24] be denied.

*(2) Voluntariness of Statement*

The defendant contends that his Fifth Amendment right against self-incrimination was violated because his August 8, 2007 statement was not made voluntarily, knowingly, and intelligently.  He asserts that his will was overborne at the time of his statement because of (1) the absence of a knowing and voluntary waiver of his rights, (2) the circumstances of his arrest, including the fact that he was stunned with a Taser, (3) the officers' ruse that Officer Jane Wright and his wife Ann Irons were also arrested and that he needed to cooperate in order to "save" them, and (4) the location, length, and circumstances of the interview.  The government asserts that

---

[5]In his Memorandum of Law in Support of Suppression Hearings [Doc. 54], filed on February 29, 2008, the defendant summarily asserts that the "unprecedented tactics" of the Forest Service also violated his Sixth Amendment right to counsel.  The Sixth Amendment right to counsel does not attach until adversarial judicial proceedings have been initiated against a defendant.  McNeil v. Wisconsin, 501 U.S. 171, 175 (1991); United States v. Cope, 312 F.3d 757, 772 (6th Cir. 2002).  Because the defendant is arguing for the suppression of a statement he gave following his arrest but before any formal proceedings were brought, the Sixth Amendment right to counsel does not appear to apply to the matter before the Court.  Moreover, the defendant's summary invocation of the Sixth Amendment in passing is insufficient to raise an issue thereto.  The Court will address the Forest Service's "tactics" and the voluntariness of the defendant's statement in the next section.

although the officers engaged in a ruse while arresting and interviewing the defendant, this did not constitute police coercion. Moreover, even if some coercive elements existed, the totality of the circumstances reveal that the defendant's will was not overborne by any coercion attributable to the police.

The Fifth Amendment protects against a defendant being "compelled in any criminal case to be a witness against himself." In light of this protection, the Supreme Court has held that law enforcement officers cannot interrogate a suspect who is in custody until they advise the suspect of his or her rights under the Fifth Amendment. Miranda v. Arizona, 384 U.S. 436,478-79 (1966); see also United States v. Salvo, 133 F.3d 943, 948 (6th Cir. 1998). "Statements elicited in noncompliance with this rule may not be admitted for certain purposes in a criminal trial." Stansbury v. California, 511 U.S. 318, 322 (1994); Salvo, 133 F.3d at 948.

Additionally, even when the Miranda warnings are administered, the government must prove that the defendant voluntarily, knowingly, and intelligently waived those Miranda rights before it may introduce an incriminating statement by a defendant. Colorado v. Connelly, 479 U.S. 157, 169-70 (1986). The government bears the burden of proving the voluntariness of the waiver by the preponderance of the evidence. Id. at 168. To determine whether a confession was voluntary, the court must examine the following factors in light of totality of the circumstances: (1) whether the police conduct was objectively coercive, (2) whether the coercive police conduct was sufficient to overbear the defendant's will when viewed subjectively from the defendant's state of mind, and (3) whether the coercive police conduct was in fact the cause of the defendant's will being overborne. McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process

45

Clause of the Fourteenth Amendment." Connelly, 479 U.S. at 167. "If the police misconduct at issue was not the 'crucial motivating factor' behind petitioner's decision to confess, the confession may not be suppressed." McCall, 863 F.2d at 459 (citing Connelly, 479 U.S. at 163-64).

*(a) factual findings*

The Court finds the following facts with regard to the defendant's arrest and the subsequent interview that resulted in his statement:

On the morning of August 8, 2007, Forest Service Agents met with the United States Marshals and members of other law enforcement agencies to plan the defendant's arrest. The officers decided to lure the defendant away from his house for his arrest because they were concerned about arresting him safely at his home. Pursuant to the officers' plan, Officer Jane Wright called the defendant and asked him to meet her in the Wal-Mart parking lot. The defendant agreed to the meeting. When the defendant arrived in the parking lot, Deputy United States Marshal Warren Mays drove to the defendant's location, parked by him, and he and the three other officers in his vehicle exited. Approximately ten officers were on the scene at the time of the defendant's arrest. The defendant was standing beside his car. Mays identified himself as a police officer, and he and three other officers approached the defendant, who had his hands in his pockets. Mays drew his weapon because he noticed a bulge in the defendant's pants pocket. Mays ordered the defendant to remove his hands from his pockets. Defendant eventually removed his hands from his pockets but took a combative stance with his arms crossed in front of him. When the defendant did not obey an order to get down, Mays signaled to Officer Ed Kingsbury, who stunned the defendant one time with a Taser. The defendant collapsed to the ground, was handcuffed, and was placed in a police

46

car. He was arrested between 10:00 and 10:30 a.m. Officer Wright was also arrested at the scene.

Forest Service Officer Brian Webb and Agent Jenny Davis got into the police car with the defendant. Agent Davis ascertained that the defendant was okay after being stunned and offered him food and water, which he declined. She told him that she and Officer Wright were friends. She said she would like to interview him, and he agreed to be interviewed. She gave him the choice of being interviewed at the jail or in a park. The defendant chose the latter and was taken to the Blockhouse location. The defendant asked about Officer Wright and whether she was in trouble. Davis told him that Wright had been arrested and was potentially in trouble. She offered to have Wright brought to the scene so that she could be present during the defendant's interview. The defendant requested this, and Wright was brought to the Blockhouse in a separate vehicle. Wright remained in handcuffs in order to maintain the ruse that she was also under arrest.

At the Blockhouse, Davis, Wright, and the defendant began the interview around 11:00 a.m. under a shade tree. Davis read the defendant his rights from a waiver form, checking off each statement as she read it. She gave the form to the defendant to read, but he could not read it because he did not have his reading glasses. He declined her offer to read the form to him again, saying that he understood his rights. She asked the defendant to sign the form. He told her that he would talk with her, but he did not want to sign anything. Davis noted this comment on the rights waiver. The defendant and Wright lay side by side on the grass, and Davis sat next to the defendant taking notes on a pad of paper as he spoke. Wright did not ask any questions during the interview but did chastise Davis at one point for acting like the defendant was a bad person. The defendant whispered to Wright during the interview and at one point told her that he loved her. Davis said the defendant was hesitant at the beginning of the interview and asked whether Wright and Mrs. Irons were in

47

trouble.  She told the defendant that Wright faced potential criminal charges for obstruction of

justice and that she had information that Mrs. Irons had been aiding and abetting him in setting fires.

Subsequently, Davis said the defendant "broke down" and admitted that he had a problem with

setting fires.  After an hour, Davis told the defendant she was taking him to jail.  At the defendant's

request, Officer Webb took him closer to the river to relieve himself.

Officer Webb offered the defendant water and a candy bar when they  got back in the

vehicle, but the defendant declined.  As Davis and Webb were transporting the defendant to jail, they

received a radio transmission from Agent Arthur stating that he had arrested Mrs. Irons.  The

defendant overheard the transmission, and Davis asked him if he would like to see his wife.  The

defendant said that he would, and they met Arthur and Mrs. Irons at Baker's Grave Road around

1:00 p.m.  Arthur confirmed with Davis that she had advised the defendant of his Miranda rights.

The defendant and Mrs. Irons, who were both handcuffed, were allowed to speak for a few minutes.

Both he and Mrs. Irons were tearful at this reunion and touched hands.  Mrs. Irons told the defendant

that she had told the officers everything she knew and that the defendant should do so too.  At one

point, the defendant told Arthur that he did not believe that his wife was under arrest.

After the defendant spoke with Mrs. Irons, Davis resumed her interview with the defendant

inside the police vehicle.  He told her that he had set the Spring Creek fire, hundreds of fires in the

Cherokee National Forest, and forty structural fires.  Although he had admitted to setting fires before

the meeting with Mrs. Irons, he gave more details afterward.  The defendant asked to relieve

himself, and Arthur took him into the woods, where he also helped the handcuffed defendant drink

from a stream.  At some point, the defendant asked to call Forest Service Employee Rex Kelly to

apologize for setting fire to his house.  Arthur and Davis drove the defendant to a bank parking lot

where they could get cellular telephone reception, and he spoke with Kelly. Arthur offered to purchase some food for the defendant, but the defendant declined.

Davis, Arthur, and the defendant returned to Baker's Grave Road, where she finished writing out the defendant's statement from her notes at around 3:00 p.m.. She read the statement to the defendant. The defendant looked over the statement and asked Davis to make a correction. Davis then read the entire statement to the defendant again. The defendant agreed to sign the rights waiver at this time and also signed the statement. The defendant was then taken to the Blount County Jail, arriving for booking at 4:25 p.m.

*(b) waiver of Miranda rights*

The defendant argues that his statement was involuntary because he did not make a knowing and voluntary waiver of his Miranda rights prior to giving it. As discussed in the previous section regarding counsel, the Court finds that the defendant was advised of his Miranda rights by Agent Davis and understood those rights, despite his initial refusal to sign the rights waiver. Although the defendant testified that Agent Davis and Officer Webb questioned him about setting fires on the way to the Blockhouse, the Court credits Agent Davis's testimony that she only engaged in small talk with the defendant prior to their arrival at the Blockhouse and that she did not begin the interview until after she had advised the defendant of his rights. Although the defendant did not sign the rights waiver before participating in the interview at the Blockhouse, a written waiver of rights is not a necessary prerequisite to a knowing, voluntary, and intelligent waiver. United States v. Miggins, 302 F.3d 384, 397 (6th Cir. 2002). The defendant was informed of his rights prior to being questioned, affirmatively stated that he understood those rights, and agreed to talk with Agent Davis.

Accordingly, the Court finds that the defendant voluntarily waived his <u>Miranda</u> rights before giving the August 8, 2007 statement. The Court next turns to the question of whether the statement was involuntary in spite of the defendant waiving his rights.

*(c) police coercion*

The first step in analyzing whether the defendant's statement was voluntary is determining whether any police coercion occurred. <u>Connelly</u>, 479 U.S. at 167, <u>McCall</u>, 863 F.2d at 459. The defendant claims that (1) the circumstances of his arrest, including the fact that he was stunned with a Taser, (2) the officers' ruse that Officer Jane Wright and his wife Ann Irons were also arrested and that he needed to cooperate in order to "save" them, and (3) the location, length, and circumstances of the interview constitute police coercion which overbore his will.

*(i) arrest*

An illegal arrest can render a subsequent statement involuntary unless an intervening event counters the taint from the arrest. <u>Kaupp v. Texas</u>, 538 U.S. 626, 632 (2003). In the present case, the defendant does not argue that his arrest was illegal. Indeed, the officers had probable cause to arrest the defendant for setting fires in the National Forrest based upon his admissions in telephone conversations with Officer Wright. Instead, the defendant argues the circumstances of his arrest[6]–that he, a sixty-year-old man who had undergone knee-replacement surgery on both knees, was surrounded by officers, stunned with a Taser, and handcuffed–constituted police coercion that implicated the voluntariness of his subsequent statement.

---

[6]The defendant also lists the handcuffing of Officer Wright as part of the coercive circumstances surrounding his arrest. The Court will consider the faked arrest of Officer Wright as part of the defendant's ruse argument.

50

The Court finds that the location chosen for the arrest and the force used by the police to effectuate it were appropriate to the circumstances. The officers had information that the defendant went armed and that he would violently resist being removed from his home by police. During the arrest, Deputy Marshal Mays believed the defendant had a gun in the pocket of his pants and signaled for the defendant to be stunned with a Taser when the defendant did not comply with his order to get down. The record shows that the defendant was stunned once and collapsed to the ground but was able to get up, was walking around, and stated that he was fine before he was even removed from the Wal-Mart parking lot. Moreover, following his arrest at Wal-Mart, the defendant was taken to another location, advised of his rights, and did not begin his interview with Agent Davis for at least thirty minutes after his arrest. The Supreme Court has "suggested that such factors as intervening time, removal of the prisoner to a different place, and change in identity of interrogators could make a second, warned statement voluntary, despite the prior involuntary statement."  United States v. Daniel, 932 F.2d 517, 520 (6th Cir. 1991) (holding that second statement was voluntary given that it occurred the next day at the jail before another officer) (citing Miranda, 384 U.S. at 496).  Thus, even if the circumstances of the defendant's arrest would have caused a statement given *at the time of the arrest* to be involuntary, the facts that the defendant was removed to the Blockhouse, given the Miranda warnings some thirty minutes after his arrest, and questioned by an officer who was not directly involved in the arrest would constitute intervening circumstances purging the taint of the arrest.  See Daniel, 932 F.2d at 520-21.  In other words, the Court finds that the circumstances of the defendant's arrest did not influence his subsequent interview, which started more than a half-hour later in a different location.

51

*(ii) ruse*

The defendant also argues that the officers' ruse that Officer Jane Wright and his wife had been arrested and that he needed to cooperate in order to "save" them constituted police coercion that rendered his statement involuntary. He maintains that the officers engaged in the ruse that Officer Wright and his wife were arrested in order to manipulate him psychologically into confessing. The government admits that law enforcement engaged in a ruse that Officer Wright and the defendant's wife had been arrested in order to encourage him to give a statement but contends that the ruse does not constitute coercive police conduct.

In some circumstances, a police officer's threats and/or promises can constitute coercion that renders a defendant's statement in response thereto involuntary. Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (holding that police threats that the defendant's young children and the financial aid upon which her family depended would be taken away if she did not cooperate rendered her statement involuntary). The Sixth Circuit has recognized that "[p]olice promises of leniency and threats of prosecution can be objectively coercive." United States v. Johnson, 351 F.3d 254, 261 (6th Cir. 2003). This problem arises in two situations: Threats and promises relating to the defendant and threats and promises as to third parties. Id. Here the defendant complains that law enforcement's threats regarding third parties–his wife and Officer Wright–rendered his statement involuntary. With regard to third parties, the Sixth Circuit has recognized that police coercion can be psychological in nature and that "'threats to arrest a member of a suspect's family may cause a confession to be involuntary.'" Id. at 262 (quoting United States v. Finch, 998 F.2d 349, 356 (6th Cir. 1993)). Whether the threat to arrest or prosecute a family member is "coercive turns on the issue of whether the threat could have been lawfully executed." Id. at 263.

52

The Sixth Circuit has examined the effect of a threat to arrest family members on the voluntariness of a defendant's confession. Finch, 998 F.2d at 356. In Finch, officers executing a search warrant for cocaine broke down the door to a residence in which they found the defendant, his mother, and his girlfriend. Id. at 351. They threatened to arrest everyone unless one person admitted that the cocaine belonged to him or her. Id. at 355. The defendant then led the officers to the drugs, which the court deemed to be equivalent to a confession. Id. at 355-56. The court held that the police lacked probable cause to arrest the two women and, thus, had "no legal basis for threatening to do so." Id. at 356. Accordingly, it found that the police threat to arrest the defendant's mother and girlfriend, when considered along with the totality of the circumstances, rendered his "statement" involuntary. Id.

The Sixth Circuit again reviewed the issue of the coerciveness of police threats to family members in Johnson. 351 F.3d at 260-63. In that case, police executed a search warrant at the defendant's half-sister's residence, where the defendant stayed on occasion, and found cocaine hidden in the headboard of the sister's bed. Id. at 256. The police then lured the defendant back to the sister's residence by threatening to arrest her if the defendant did not admit ownership of the drugs. Id. The defendant returned and confessed but then subsequently claimed that his confession was involuntary. Id. The court reasoned that "the question [of] whether the threat to prosecute [the sister] was coercive turns on the issue of whether the threat could have been lawfully executed." Id. at 263. To answer that question, the court looked to whether the officers had probable cause to believe that the sister was involved in the crime:

> While [the defendant's half sister] was not charged in a drug distribution conspiracy or as an aider or abettor, the investigating officers could have reasonably suspected that her involvement rose to such levels. Moreover, the drugs here were found in the bed occupied by [her]. These facts were sufficient to create probable cause to arrest.

53

Therefore, the police would not have acted wrongfully had they arrested [the sister] and were not coercive in threatening to do so.

Id.

The Fifth and Eleventh Circuits have also held that the threat to prosecute a third party does not render a defendant's subsequent confession involuntary if law enforcement had probable cause to prosecute the third party. Newland v. Hall, 527 F.3d 1162, 1189 (11th Cir. 2008) (holding that attorney was not ineffective for failing to challenge voluntariness of confession when police had probable cause to arrest the defendant's girlfriend at the time they threatened him with her arrest); Thompson v. Haley, 255 F.3d 1292, 1297 (11th Cir. 2001) (determining no police coercion when officer threatened to charge defendant's girlfriend with murder unless he confessed because the officer had probable cause to arrest her); Allen v. McCotter, 804 F.2d 1362, 1364 (5th Cir. 1986) (holding confession not involuntary when police had probable cause to arrest the defendant's wife at the time they threatened to do so).

In the present case, Agent Bishop staged the arrest of the defendant's wife Ann Irons while the defendant was in the process of making a statement. The defendant argues that the police never had any intention of prosecuting Mrs. Irons. Agent Bishop testified that Mrs. Irons told him that she drove the defendant to and from locations from which he set out to start fires and that she purchased supplies, such as candles, for him. Bishop stated that based upon this information, Mrs. Irons could have been prosecuted for aiding and abetting her husband in setting fires in the Cherokee National Forest. Because law enforcement was in possession of this information, the threat to prosecute Mrs. Irons could have been lawfully executed. Moreover, the Court finds no evidence in the record that law enforcement ever promised Mrs. Irons that they would not prosecute her. The fact that, unbeknownst to the defendant, they had chosen not to do so does not make the "ruse" of arresting

54

Mrs. Irons coercive.

Moreover, the Court notes that salient portions of the facts of this case resemble those in the Eleventh Circuit case of Thompson v. Haley, 255 F.3d 1292 (11th Cir. 2001). In that case, the defendant was interrogated on the day of his arrest and while in custody regarding his involvement in a murder. Id. at 1295. The defendant alleged the detective told him that the detective had information that linked the defendant's girlfriend to the murder scene, that she was currently incarcerated, and that she would face the electric chair along with him. Id. at 1295-96. According to the defendant, the detective offered to let the defendant's girlfriend go if he confessed. Id. at 1296. The defendant asked to speak with his girlfriend, who was brought to him in handcuffs. Id. After a conversation with her in which she told him that she loved him, the defendant agreed to confess. Id. The Eleventh Circuit held that even if the defendant's version of the events were true, it would not render his confession involuntary as a matter of law because the defendant's girlfriend had "voluntarily implicated herself in the murder" before the defendant was arrested. Id. Likewise, the instant defendant's emotional meeting with Mrs. Irons, in which she was handcuffed, does not constitute police coercion that could render his statement involuntary.

Next, the Court turns to the arrest of Officer Wright. First, although Officer Wright had befriended the defendant and his wife, the Court does not find that she stood in a relationship to him that was tantamount to being a family member for purposes of this analysis. Although the defense has suggested that some type of romantic relationship existed between the defendant and Officer Wright, the Court finds that the record does not support such a conclusion. Officer Wright testified that the defendant had brought up the issues of sex and marriage during some of their telephone conversations but that she had changed the subject when the defendant brought these matters up.

She also stated that during the defendant's interview at the Blockhouse, he had whispered to her that he loved her and would never say a word against her, but she did not respond to this statement. Moreover, Mrs. Irons testimony explaining the February 1, 2008 letter she wrote to the defendant reveals Mrs. Irons' belief that Officer Wright was upset about the media portraying her as having a relationship with the defendant. Accordingly, the Court finds that any notion of a romantic relationship between the defendant and Officer Wright existed, if at all, only in the defendant's mind. The defendant's unrequited romantic designs regarding Officer Wright do not constitute objectively coercive police conduct.

On the other hand, the faked arrest of Officer Wright was conducted in order to encourage the defendant to confess. Special Agent Arthur testified that he believed that the manner in which they planned to conduct the defendant's arrest would provide a "psychological advantage for an interview." Agent Bishop testified that Officer Wright was arrested and handcuffed in the Wal-Mart parking lot because the law enforcement officers wanted the defendant to believe that she was in trouble and that he could help save her job by giving a statement. When the defendant asked about Officer Wright, Agent Davis told him that she could be prosecuted for obstruction of justice. Unlike with Mrs. Irons, the record contains no evidence that law enforcement had probable cause to arrest Officer Wright. Thus, the Court must examine whether the deception in which the law enforcement officers engaged constituted police coercion.

"An involuntary confession may result from psychological, no less than physical coercion by law enforcement officials. However, not all psychological tactics are unconstitutional." Ledbetter v. Edwards, 35 F.3d 1062, 1067 (6th Cir. 1994) (internal citations omitted). Indeed, the Supreme Court has held that police deception does not always implicate the voluntariness of a

confession.  See Illinois v. Perkins, 496 U.S. 292, 297 (1990) (holding that "Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one[, such as an undercover agent,] he supposes to be a fellow prisoner"); Frazier v. Cupp, 394 U.S. 731, 739 (1969) (determining that a false statement by law enforcement that codefendant had confessed and implicated the defendant did not render the defendant's statement involuntary).  To ascertain whether any given tactic is unconstitutional, the court must examine the "totality of the circumstances" of each case.  Ledbetter, 35 F.3d at 1067.

In Spano v. New York, the defendant confessed after a police officer friend engaged in a ruse in which he repeatedly implored the defendant to give a statement in order to save the officer's job. 360 U.S. 315, 319 (1959).  In that case, Spano called a friend who was a policeman and admitted that he had killed the victim.  Id. at 317.  Spano subsequently surrendered to the police and was taken into custody.  Id.  Spano was questioned throughout the evening hours by various officers with no success, so the officers got Spano's police officer friend to tell Spano falsely that his job was in jeopardy due to Spano's telephone call.  Id. at 319.  The police officer friend spoke with Spano four times, finally gaining a confession.  Id.  Considering the totality of the circumstances, including Spano's inexperience with the police and emotional instability, the fact that he was questioned through the night by many officers, and the entreaties by his childhood police officer friend, the Supreme Court held that Spano's "will was overborne by official pressure, fatigue and sympathy falsely aroused[.]" Id. at 323.

In contrast, in Ledbetter, the Sixth Circuit examined a situation in which the interrogating officer questioned the defendant for three hours and ultimately falsely told the defendant that he had fingerprint evidence linking him to the crime and then faked the victim's identification of the

57

defendant through a two-way mirror. 35 F.3d at 1066. The defendant then began crying and confessed to the crime. Id. In finding the defendant's confession to be voluntary, the Sixth Circuit contrasted the circumstances before it with those in Spano and Lynumn, both cited above:

> Schneckloth[v. Bustamonte, 412 U.S. 218, 226 (1973)] teaches that the key issue is whether a confession arises from the defendant's will being overborne. In the Supreme Court cases that best support defendant's position, Spano and Lynumn, the circumstances pointed much more strongly to a false confession dictated by an overbearing of the will than do the circumstances in this case. In Lynumn, the concern was outright fear of adverse consequences, elimination of government benefits, which may be just as real as the physical fear of adverse consequences in outright torture. In Spano, the concern was for adverse consequences to the defendant's police officer friend. In our case, the only adverse consequences being presented to the defendant were the results of ultimately being convicted of the crime. A defendant who is completely innocent might well confess in the circumstances of Spano or Lynumn, for *fear of the extraneous adverse consequences*. By contrast, an innocent defendant in the circumstances in our case would have little incentive to render a false confession. A defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is.

Id. at 1070 (emphasis added).

In the present case, the officers sought to elicit the defendant's confession by causing him to fear the extraneous (and false) adverse consequences to Officer Wright. Although the defendant and Officer Wright did not have the longstanding friendship described in Spano, the defendant had been confiding in Officer Wright, and the forestry agents sought to exploit their friendship. Accordingly, the Forestry agents' ruse with regard to Officer Wright was objectively coercive. Moreover, Wright's continuing presence at the defendant's interview at the Blockhouse only intensified that coercion. Whether the effect of the ruse was sufficient to overbear the defendant's will must be examined in the totality of the circumstances surrounding the interview. The defendant argues that the circumstances of the interview were also coercive.

58

*(iii) location, length, and circumstances of the interview*

Finally, the defendant contends that the location, length, and circumstances of the interview constitute police coercion which overbore his will. In this regard, he argues that he was taken to a remote, open field for his interrogation rather than to jail. While he was interrogated, Officer Wright was lying beside him, whispering to him about sex and marriage. He maintains that these circumstances could not have existed if he had been interrogated in the Blount County Jail. He asserts that he did not arrive at the jail until after 4:30 p.m., some six to six and one half hours after his arrest. During this time, he was given no food or water. Finally, he contends that he could not read the rights waiver form nor the statement, which Agent Davis wrote out, because he did not have his reading glasses. The government responds that the location of the interview as well as many of the circumstances, such as Officer Wright's being brought to the Blockhouse, the defendant's refusal of food and drink, and his mid-interview meeting with his wife, were of the defendant's own choosing and, therefor cannot constitute police coercion. It also contends that the defendant was actually questioned for only three hours, which was not coercive.

The issue of the coercive nature of the environment or location in which a defendant is questioned typically arises when the court is faced with determining whether a defendant is in custody for purposes of receiving the Miranda warnings. See United States v. Swanson, 341 F.3d 524, 529 (6th Cir. 2003); United States v. Crossley, 224 F.3d 847, 861 (6th Cir. 2000); United States v. Salvo, 133 F.3d 943, 950(6th Cir. 1998). In these types of cases, interviews in public places are deemed less coercive than those in "a station-house or security room, which can be inherently intimidating," Salvo, 133 F.3d at 951:

> The place of the questioning[, outside of a tattoo parlor,] was not hostile or coercive.
> The questioning took place outside, in a public space, with other agents and at least

59

seven or eight other people from inside the shop nearby. The Supreme Court addressed detentions in public spaces in <u>Berkemer</u> in the context of detentions during traffic stops. The Court noted that "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [detainee's] fear that, if he does not cooperate, he will be subjected to abuse."

<u>Swanson</u>, 341 F.3d at 529 (internal citations omitted) (second alteration in original) (quoting

<u>Berkemer v. McCarty</u>, 468 U.S. 420, 438-39 (1984)). In the present case, the interview took place

under a tree in a public park called the Blockhouse. Although this part of the interview was not in

a location that was inherently intimidating like a jail, it was at least somewhat remote. The Court

notes that Officer Webb testified that he remained by his vehicle to make sure that the interview was

not interrupted by members of the public. Although the possibility of public scrutiny was present,

the Court agrees with the defendant that the remoteness of the location fostered certain aspects of

the interview, such as Officer Wright lying beside the defendant during the interview while both

were handcuffed, that could not have occurred if the defendant had been questioned at the Blount

County Jail.

Although the Court finds that the remoteness of the Blockhouse location is coercive,

conducting the interview in this location does not constitute police coercion because it was the

defendant who chose to be interviewed there rather than at the jail. The defendant also asked for

Officer Wright to be brought to the interview location. Although he was offered food and drink on

at least three occasions by Agents Davis and Arthur, the defendant declined their offers and only

consented to a drink of water from a stream near the Baker's Grave Road location, which Agent

Arthur facilitated. Although the defendant was apparently arrested without his reading glasses, this

does not amount to police coercion either.

60

Finally, the Court also finds that the length of the interrogation in this case–around three hours according to the testimony of Agents Davis and Arthur–does not constitute police coercion. The defendant was arrested between 10:00 and 10:30 a.m. and was booked into the Blount County Jail at 4:25 p.m., a total of six to six and one-half hours. The Court finds that the defendant was only questioned for approximately half of this time and that the rest of the time was devoted primarily to travel to and from the various locations. Although lengthy questioning can amount to police coercion, the questioning in this case does not rise to that level. See Ledbetter, 35 F.3d at 1069 (questioning from midnight to 3:00 a.m. not coercive); but, c.f., Spano, 360 U.S. at 1207 (deeming coercive questioning lasting eight consecutive hours through the night). Accordingly, the Court determines that the location, length and circumstances of the defendant's interview, do not amount to objective police coercion. On the other hand, the coercive nature of the remote location of the interview will be considered in evaluating the totality of the circumstances below.

*(d) effect of police coercion*

The Court has found that law enforcement's use of the ruse that Officer Wright was arrested and that the defendant should confess in order to protect her from prosecution was objectively coercive, but police coercion alone does not render a defendant's confession involuntary. The Court must also examine whether the coercive police conduct was sufficient to overbear the defendant's will and was in fact the cause of the defendant's will being overborne. McCall, 863 F.2d at 459. In determining "whether the will of the accused has been overwhelmed by official pressure[,]" courts

> consider the psychological impact on the accused by the totality of the circumstances of the confession, including the age of the accused, his level of education and

61

intelligence, his physical condition and emotional state at the time of the confession, his expressed fears of violent reprisals, actual physical punishment, the proximity of the coerciveness of the confession as given, and the inherent coerciveness of the confession as given.

United States v. Wrice, 954 F.2d 406, 411 (6th Cir. 1992).

The government argues that even if some police coercion occurred, the totality of the circumstances show that the defendant's will was not overborne by that coercion. Specifically, it argues that the defendant's statement was a product of his free rational choice because the questioning was not prolonged, the defendant was not subjected to physical punishment, the defendant was lounging comfortably in a location of his own choosing, the defendant had voluntarily waived his Miranda rights, and the defendant told the officers that he believed that the arrest of Officer Wright was a ruse. The defendant argues that his inexperience with criminal law when combined with the extreme show of force during his arrest and the illusory threats regarding the prosecution of his wife and his friend resulted in psychological coercion on the part of law enforcement sufficient to overbear and that actually overbore his will.

In examining the totality of the circumstances, the Court finds that although the record reflects no prior criminal experience for the defendant, testimony of the forestry agents revealed that he had encountered law enforcement officers on numerous occasions. Moreover, the testimony regarding his practice of shooting into the woods and Mrs. Irons testimony that he changed his method of setting fires reveals that he had taken measures in the past to intimidate or outsmart law enforcement. On the other hand, the defendant's emotional state at the time he was interviewed by the officers reveals that he was overwrought. Agent Davis testified that while at the Blockhouse, the defendant told her that he believed the arrest of Officer Wright to be a ruse. She also stated that she believed the defendant to be "toying" with her, when he wrote an "X" rather than his signature

at the Blockhouse. Despite his initial seemingly calculating demeanor, Davis stated that the defendant reached an emotional breaking point, which occurred in conjunction with his meeting with Mrs. Irons at the Baker's Grave Road location. Although he had already confessed to setting fires by this point, he was finally willing to disclose the details of his crimes to Davis after this point.

The Court finds no evidence that the defendant feared violence toward himself at the time of his interview. The Court does find that he was concerned with the legal ramifications toward Mrs. Irons and Officer Wright, as early as his ride to the Blockhouse after his arrest. He inquired about what would happen to them more than once, and he rolled over Officer Wright to lie between her and Agent Davis during the interview at the Blockhouse as if he were protecting her from Davis. These inquiries and actions by the defendant reveal that the ruse was affecting him. The Court also finds that the defendant experienced no physical punishment during the interview. Although he had been stunned with a Taser earlier that morning, the testimony reveals that he had recovered from that experience before the interview began.

The Court finds that the circumstances of the confession–that it occurred at a remote location with the defendant and Officer Wright handcuffed and lying next to each other on the ground–was inherently coercive. Moreover, the threatened arrest and prosecution of Officer Wright was in immediate proximity to the defendant's statement because she was handcuffed and lying next to him as he was interviewed. Officer Wright did not ask the defendant any questions, nor did she (in contrast to the police officer friend in Spano) plead with the defendant to confess to save her job. Nevertheless, she was physically present and actively maintaining the ruse that she had been arrested while Agent Davis questioned the defendant at the remote Blockhouse location. Both Agent Arthur and Agent Bishop testified that gaining the defendant's confession was the goal of the ruse of

arresting Officer Wright. Like in <u>Spano</u>, the combination of the police deception with the totality of the surrounding circumstances rendered the defendant's statement involuntary. "The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law[.]" <u>Spano</u>, 79 U.S. at 1205-06. The Court finds that in this case, law enforcement took their ruse too far.

The Court finds that the totality of the circumstances surrounding the defendant's statement reveal that the police coercion involved overbore the defendant's will. Accordingly, the Court recommends that the defendant's Motion to Suppress Defendant's August 8, 2007 Statement as a Result of Law Enforcement's Illegal "Save Jane" Ruse [Doc. 25] be granted.


## IV. CONCLUSION

After thoroughly considering the parties briefs and arguments, the testimony at the evidentiary hearings, and the relevant caselaw, the Court **RECOMMENDS** that the defendant's Motion to Suppress Confidential Marital Communication [**Doc. 23**] and Motion to Suppress Defendant's August 8, 2007 Statement as a Result of Law Enforcement's Illegal "Save Jane" Ruse [**Doc. 25**] be **GRANTED**. The Court also recommends that the defendant's Motion to Suppress Defendant's Statement to Officers after Request for Counsel [**Doc. 24**] and his Motion *In Limine* to Exclude All Derivative Evidence Obtained Directly or Indirectly from Confidential Marital

Communications Pursuant to *Wong Sun v. United States* and the Fruit of the Poisonous Tree

Doctrine [**Doc. 40**] be **DENIED**.[7]

                              Respectfully submitted,


                              _____s/ H. Bruce Guyton_____
                              United States Magistrate Judge

---

[7]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).